ALCIE MCCOY, WIDOW OF LLOYD A. MCCOY, DECEASED, APPELLANT, v. GOOCH MILLING AND ELEVATOR CO., APPELLEE.

54 N. W. 2d 373

Filed July 11, 1952.   No. 33208.

*Mockett, Davies, Pace & Perkins,* for appellant.

*Davis, Stubbs & Healey,* and *Richard D. Wilson,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is a workmen's compensation case. Alcie Mc-Coy, widow of Lloyd A. McCoy, deceased, filed her petition in the Nebraska Workmen's Compensation Court seeking compensation benefits which she claims are due from the Gooch Milling and Elevator Co. under the workmen's compensation law because of the death of her husband on April 22, 1950. She bases her claim on the contention that decedent died as a result of an operation made necessary because of injuries he suffered in an accident that occurred on April 5, 1950, while he was employed by the Gooch Milling and Elevator Co., which accident she claims occurred in the course of and arose out of his employment. Hearing was had to the member of the workmen's compensation court assigned thereto. He entered an award in claimant's favor. Within the time fixed by statute the company filed its waiver of rehearing before the workmen's compensation court and appealed directly to the district court for Lancaster County. Trial was had in the district court and on January 25, 1952, the court rendered a decree in favor of the company, vacated and set aside the award of the judge of the workmen's compensation court, and dismissed the action. Her motion for new trial having been overruled, claimant appealed.

Appellant's first contention is that the court erred in overruling her motion to dismiss the appeal. This motion was made on October 4, 1951, at the beginning of the trial. It was based on the fact that trial had not been had within 30 days after the docketing of the appeal from the award of the judge of the workmen's compensation court. The appeal was filed in the district court on October 2, 1950.

Section 48-179, R. S. Supp., 1951, relating to rehearings before the workmen's compensation court sitting en banc, provides in part: "* * * within thirty days thereafter (the workmen's compensation court) shall proceed to hear said cause de novo." (Insertion ours.)

Section 48-181, R. S. Supp., 1951, provides, when rehearing is waived and appeal taken directly to the district court, as follows: "Such appeal to the district court shall be taken and perfected in the same manner as provided for appeals to the compensation court. In such cases the trial in the district court shall be a trial de novo."

It is apparently appellant's thought that the foregoing quote from section 48-181, R. S. Supp., 1951, makes the 30-day provision in section 48-179, R. S. Supp., 1951, applicable to district courts. While section 48-181, R. S. Supp., 1951, does provide that "Such appeal to the district court shall be taken and perfected in the same manner as provided for appeals to the compensation court," however, this language would not include the 30-day provision as to trial in the workmen's compensation court as provided in section 48-179, R. S. Supp., 1951, as the trial, after the appeal is perfected, is no part of the appeal itself. The only language applicable to trial in the district courts is the following from section 48-181, R. S. Supp., 1951: "In such cases the trial in the district court shall be a trial de novo." There is no time requirement in this language nor do we find any relating to trials in the district courts when a rehearing before the full workmen's compensation court is waived and an appeal taken direct from the award of a judge of the workmen's compensation court thereto.

The Workmen's Compensation Act, as appellant contends, was undoubtedly intended by the Legislature to bring about an expeditious settlement of claims between injured employees and their employers. This is self-evident from the numerous provisions in the act fixing the time within which certain procedural acts must be performed. But what is true of claims arising under the Workmen's Compensation Act is likewise true of other litigation. All litigation should be disposed of by the courts as expeditiously as circumstances will permit and to accomplish this purpose counsel for the parties

involved owe a duty to prepare and submit their cases at the earliest possible date.

After the appeal was perfected to the district court, and the case was for trial de novo, the burden then rested on the appellant to establish her claim in that court. The petition on appeal was filed on October 2, 1950. Appellant filed her answer thereto on October 16, 1950. Appellee filed a reply on October 20, 1950. No further pleadings were filed until October 4, 1951, when appellant filed a reply to appellee's reply. However, on August 30, 1951, appellant filed a "Request for Admissions" to which appellee responded on September 8, 1951. Trial was commenced on October 4, 1951. We find nothing in the record to indicate that a request for trial was made and denied or that appellee in any manner endeavored to delay it. Under these circumstances we find no error in the court's overruling appellant's motion to dismiss.

Factually the appellant contends her claim that the disability which the operation was designed to remove was compensable can be sustained on either of two theories. First, that decedent was suffering from a recurrent bilateral hernia, compensable in origin, which culminated in disability within one year of the commencement of this action on July 10, 1950, or second, that the fall of April 5, 1950, aggravated a nondisabling recurrent bilateral hernia to the extent that it became disabling.

Whether or not the operation of April 21, 1950, for the purpose of correcting the condition above referred to was necessary and, if so, a proximate cause of decedent's death on April 22, 1950, we need not consider unless appellant is correct in one or the other of her contentions that the disability which the operation sought to correct was compensable.

"On any appeal to this court in a workmen's compensation case the cause will be here considered de novo upon the record." Beam v. Goodyear Tire and Rubber

Co., 152 Neb. 663, 42 N. W. 2d 293. See, also, Peek v. Ayres Auto Supply, 155 Neb. 233, 51 N. W\ 2d 387.

"The burden of proof is upon the claimant in a compensation case to establish by a preponderance of the evidence that personal injury was sustained by the employee by an accident arising out of and in the course of his employment." Beam v. Goodyear Tire and Rubber Co., *supra*.

As to the first of these contentions the record shows the decedent began his employment with Gooch Milling and Elevator Co., hereinafter referred to as the company, in 1925 and was in its employ at all times up until his death on April 22, 1950; that on November 23, 1938, while lifting 140-pound bags of flour into a feeder, he accidently injured himself; that as a result of this accident he developed a bilateral inguinal hernia which resulted in his being disabled as of December 3, 1938; that on December 5, 1938, he was operated on to correct this condition; that the results of the operation were satisfactory and decedent was discharged from the hospital on December 19, 1938; that he returned to work on January 14, 1939; that during this period of disability decedent was paid compensation by the company's compensation insurance carrier for total temporary disability and also for his medical and hospital expenses; that no lump sum settlement of the company's liability resulting from this condition was ever made and entered into by the parties and approved by a court; that about a month after returning to work the condition recurred; that decedent was able to control his condition by means of a truss which he thereafter wore; and that further surgery to correct this condition was not had until April 21, 1950.

"An employee, sustaining an accidental injury arising out of and in the course of his employment, will not be denied compensation for failure to give notice of claim within six months or to commence his action within one year from the date of the accident, when it appears

from the evidence that the injury was latent and did not result in compensable disability until after the expiration of the time for giving notice of claim and commencing action, provided notice is given and action commenced within the statutory period after the employee has knowledge that the accident has caused a compensable disability." Travelers Insurance Co. v. Ohler, 119 Neb. 121, 227 N. W. 449.

"* * * failure to give the employer notice of a claim for compensation within the statutory period of six months is not necessarily a defense, if the accidental injury is latent and progressive and cannot with reasonable certainty be recognized at first as compensable, where notice is given within six months from the time the employee acquires knowledge of a compensable disability as a result of the accident." Flesch v. Phillips Petroleum Co., 124 Neb. 1, 244 N. W. 925. See, also, § 48-133, R. S. 1943.

"When an employee receives an accidental injury arising out of and in the course of the employment which activates a dormant disease, the failure to file a petition within a year is not a bar if the petition is filed within one year after the employee acquires knowledge of a compensable disability." Dryden v. Omaha Steel Works, 148 Neb. 1, 26 N. W. 2d 293. See, also, § 48-137, R. S. 1943.

"The word 'latent' is defined as the time within which a disease is supposed to be in existence without manifesting itself, that is, during which time it lies dormant." Kurtz v. Sunderland Bros. Co., 124 Neb. 776, 248 N. W. 84.

"In the event of failure to comply with the formal statutory requirements, with reference to claim for compensation as distinguished from notice of injury, recovery of compensation may be permitted only if the employee's accidental injury is latent and progressive and cannot with reasonable certainty be recognized at first as compensable, where claim for compensation is made within six months from the time the employee

acquires knowledge of a compensable disability as a result of the accident." Park v. School District, 127 Neb. 767, 257 N. W. 219.

"A 'recurring hernia' at the same spot, as the word 'recurring' signifies, is a return of a former hernia, which, though temporarily arrested by the operation, * * * a successful result did not follow a skillful operation." Crawford v. Tampa Inter-Ocean S. S. Co., Inc., (La. App.), 150 S. 875. And, as therein correctly held: "The original injury received by Crawford on May 28, 1932, is responsible for his present condition."

"Where the statute has become a bar to a claim for compensation during the lifetime of the injured employee, it is also a bar to a claim by his dependents after his death." Price v. Burlington Refrigerator Express Co., 131 Neb. 657, 269 N. W. 425.

When the hernial condition resulting from the accident of November 23, 1938, and sought to be corrected by the operation of December 5, 1938, recurred in February 1939, about a month after he returned to work, there is no question but what decedent was fully aware of that fact. At that time, under the provisions of the workmen's compensation law, he could have had the recurrent condition corrected at the expense of his employer, both for medical and hospital expenses, and have been paid compensation for any period he was disabled because thereof. This he did not choose to do. Since this condition was not latent but known to decedent, the period of time provided by the workmen's compensation law in which he could assert his rights began to run. When that period expired his rights ceased to be enforceable. It appears that at some time subsequent thereto the recurrent hernial condition reached a stage where an operation was performed to correct it. That fact did not change the situation.

We find the time within which decedent could make claim because of the recurring hernial condition in February 1939 had expired in his lifetime and the fact that

the recurrent hernial condition worsened, making necessary corrective surgery in April 1950, did not toll the statute. Neither did it create a new right which could relate itself back to the accident of November 23, 1938, because there was nothing latent about the hernial condition when it recurred in February 1939.

As to the second of these contentions the record establishes, without dispute, the following: That on April 5, 1950, while working decedent fell backward off the top of a 4-foot stepladder; that as a result of the fall he received a comminuted type of Colles fracture of his left wrist; that he was taken to the Lincoln General Hospital where Dr. C. Fred Ferciot took care of his injury; that he returned to his home on April 6, 1950; that on April 21, 1950, he was operated on by Dr. H. B. Morton to correct a disabling recurrent bilateral inguinal hernial condition; and that he died on April 22, 1950.

The first question that must be decided, which relates to this question, is whether or not certain evidence admitted by the trial court, over objection, was admissible. On rebuttal appellant testified that on April 6, 1950, while she was bathing decedent and in response to her remark about how much larger the hernia was, "He said it was getting larger." She also testified that a day or two later, "He said he had to have this hernia taken care of before he could go back to work, because the last fall had just wrecked him."

Both parties agree this testimony 'would not have been admissible as part of appellant's case in chief. This we think is correct in view of our holdings in Price v. Burlington Refrigerator Express Co., *supra*; Hamilton v. Huebner, 146 Neb. 320, 19 N. W. 2d 552, 163 A. L. R. 1; and Muff v. Brainard, 150 Neb. 650, 35 N. W. 2d 597.

In its defense the company introduced numerous witnesses with whom decedent had come in contact shortly after the accident. All these witnesses testified that decedent had made no statement or complaint to them that his hernial condition had in any way been affected

by his fall on April 5, 1950. This evidence was all negative in character. It is on the theory that she has the right to rebut this testimony that appellant contends the evidence is properly admissible. The company, on the other hand, contends that while the adverse party is entitled to prove the remainder of a conversation, where part of a conversation is put in evidence, it is limited to statements made at the same time and place, in other words, to that which is part of the same conversation but which may modify or explain the part admitted.

But here the question does not relate to conversations admitted but to testimony as to what he did not say. That is negative testimony relating to the question involved. Under this situation we think the court properly admitted the evidence.

"When an employee meets with an accident which accelerates or aggravates an existing impairment to a state of disability, such disability not being the result of a natural progression of the impairment, there may be an award of compensation therefor." Earhart v. Cyclone Fence Co., 99 Ind. App. 48, 190 N. E. 558.

The evidence discloses that on April 5, 1950, decedent's tour of duty was from 4 p. m. to midnight; that shortly after 6 p. m. of that day he was working on the sixth floor of the company's place of business in Lincoln, Nebraska; that he was then engaged in turning up grease cups on flour sifters; that to get to the grease cups, some of which were located near the top of the flour sifters, decedent used a 4-foot stepladder with a platform fastened on the top; and that while standing on this platform performing this work he fell backwards onto the floor.

Oscar Backman, who was running the flour mill at that time, was working on the sixth floor and heard decedent fall but did not actually see the accident. He immediately went to the place of the accident. There he found decedent on his feet holding his left wrist,

which decedent told him he thought he had broken in the fall. Decedent's only complaint was in regard to his wrist. He was able to walk in a normal manner and without assistance, walking some 30 feet to the elevator which they took to the first floor. There they met Harold Payne, another company employee. Decedent stayed with Payne until Lloyd E. Graham, the plant superintendent, arrived. Decedent told Payne he had broken his wrist but complained of nothing else. He walked without assistance. Soon Lloyd E. Graham, the company's plant superintendent, arrived. He had been called by Backman. Graham took decedent, upon the latter's request, to the Lincoln General Hospital. Decedent walked to Graham's car and got in. When he got to the hospital he got out of the car and walked into the hospital. His only complaint to Graham was about his wrist. His walk was normal at all times.

At the hospital Dr. C. Fred Ferciot, whom decedent asked to have take care of him, treated the injury which proved to be a comminuted type of Colles fracture of the left wrist. He made no complaint to Dr. Ferciot of anything except his wrist. After decedent was released from the hospital on April 6, 1950, he reported to Dr. Ferciot at his office on April 7, 8, 10, 14, and 18, 1950. On these occasions he mentioned that he had a hernia but never mentioned that he thought it had been affected by the fall. In fact, on the last call, he mentioned to Dr. Ferciot that he was planning to have the hernial condition taken care of while he was disabled because of his wrist.

After decedent was released from the hospital on April 6, 1950, he went home in a taxi arriving there about 2 p. m. That evening, because of the condition of his arm, appellant bathed him. She remarked how much larger his hernia was and she testified he replied, "* * * it was getting larger."

About a week after the accident decedent called Graham and asked him to stop at his house on his way

home. This Graham did. Decedent then suggested to Graham that he thought it would be a good idea to have his hernial condition, which was getting worse, taken care of while he was disabled with his broken wrist and wondered if the medical plan of the company would take care of it. Graham told decedent he did not know but would talk to H. B. Lilly, the company's president, about it as Lilly was in charge thereof.

Lilly testified that some ten days or two weeks after the accident decedent called him on the phone and told him he had had a hernial condition for some time, and since he would be off work for some time because of his broken wrist he thought it would be a good idea to have it repaired. He asked if the company's medical plan would cover the doctor's bill for the operation. Lilly advised decedent that it would and, in fact, it was paid by the company out of the funds held in trust for that purpose.

On April 17, 1950, decedent consulted Dr. H. B. Morton in regard to his hernial condition. Dr. Morton testified he found decedent suffering with a disabling recurrent bilateral direct inguinal hernia, the left one being the largest and about three inches in diameter. The operation of April 21, 1950, was for the repair of these hernias. He also testified that decedent complained of the fact that he could not hold the left hernia with his truss and consequently was uncomfortable with it, and that he was anxious to have it repaired. Dr. Morton further testified that decedent did not at any time indicate to him he thought there was any connection between the then condition of his hernias and the accident of April 5, 1950, but did tell him that he was off work because of his broken wrist and that while off work he would like to have his hernial condition repaired.

In his personal history of decedent, made on April 20, 1950, when he entered the Bryan Memorial Hospital for the operation of April 21, 1950, Dr. Morton stated under "Present Illness" as follows: "The hernia on the

left came back several months ago and is gradually getting larger."

Without going into further detail this resume of the evidence gives a sufficiently comprehensive view of the facts as they relate to decedent and his hernial condition from the time of the accident up until his operation on April 21, 1950. It will be noted that to no one with whom he came in contact after the accident, except appellant, did he indicate that he associated the then condition of his hernias with the accident which he suffered on April 5, 1950. This is particularly significant as to Dr. Morton whom he consulted in regard to having them repaired.

We realize appellant testified to the contrary, as is evidenced in part by her testimony hereinbefore quoted, and that Dr. Morton, based on a hypothetical question, gave as his opinion that by reason of the fall decedent's hernial condition changed from a nondisabling one to one that was disabling. However, Dr. Morton also testified: "* * * I found no evidence which would lead me to say whether this had developed suddenly or gradually." Also, "That (trauma) is an unusual causitive factor, for a hernia to develop on aggravation, * * *." And further, "Q. Therefore a secondary, but it would be a basis of your findings, was also the fact this recurrent bilateral hernia was the direct result of this falling off a ladder, rather than any gradual enlargement of the original hernia. You have no way of measuring that, except it could happen that way, or could happen from a gradual atrophy of the system, or of the muscles? A. I think the answer to that last question would have to be yes; that either process could. Q. And his working at his trade, with an incipient hernia, or a hernia the size of a golf ball, over a period of years, and at his age, could result in an enlargement of the opening there, and a weakening of the wall. It could be that, or could be by reason of a fall, or by reason of a traumatic impalement on a sharp board, or something of that sort

or other? A. My opinion on that would be, yes."

We come to the conclusion that the evidence establishes decedent had a hernial condition that was gradually getting worse; that the fall suffered in the accident on April 5, 1950, in no way affected that condition; that because the company had a medical plan which would cover the medical expenses of an operation decedent decided to have this condition relieved by an operation while he was off duty as the result of the broken wrist which he suffered from his fall on April 5, 1950; and that unfortunately the operation resulted in death. Under these circumstances we find no causal connection between the accident and the hernial condition which necessitated the operation.

In view of the foregoing it is not necessary to discuss the question of whether or not the operation was a proximate cause of the death. Even if it was so determined that would not help appellant in view of our finding that there was no causal connection between the accident and the hernial condition making the operation necessary.

Since our decision is the same as that of the trial court we affirm its decision.

AFFIRMED.