WILLIAM MARION GILBERT, APPELLANT, V. METROPOLITAN UTILITIES DISTRICT OF OMAHA, A MUNICIPAL CORPORATION, APPELLEE.

57 N. W. 2d 770

Filed April 3, 1953.   No. 33281.

*Warren C. Schrempp, David S. Lathrop,* and *E. D. O'Sullivan, Jr.,* for appellant.

*George C. Pardee, G. H. Seig,* and *Harry H. Foulks, Jr.,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action under the Nebraska Workmen's Compensation Act. The case was first tried before a judge of the Nebraska Workmen's Compensation Court where an award was entered in favor of the claimant, William Gilbert, and against his employer, the Metropolitan Utilities District. The award was that the claimant suffered a 25 percent permanent partial disability for which he was entitled to compensation at the rate of $9.54 a week for a period of 300 weeks from and after the date of the accident. His salary at the time of the accident was $57.24 a week. The defendant, Metropolitan Utilities District, filed a waiver of rehearing before the three members of the workmen's compensation court, and appealed directly to the district court for Douglas County. The case was tried in the district court, which found generally in favor of the defendant and against the plaintiff; that the plaintiff failed to establish that his claim for compensation with respect to an alleged injury of June 9, 1950, was made in accordance with statutory requirements; and that the plaintiff failed to prove by a preponderance of the evidence that he was injured in an accident as that term is defined in the Nebraska Workmen's Compensation Act. The award of the workmen's compensation court was reversed and vacated. The plaintiff filed a motion for new trial which was overruled, and plaintiff appealed.

The appellant assigns as error (1) that the trial court erred in finding that the plaintiff had failed to make claim for compensation within 6 months from the date of the injury as provided for by law; (2) that the trial court erred in finding that the plaintiff had not sus-

tained an accident as that word is defined by the Nebraska Workmen's Compensation Act; and (3) that the trial court erred in finding that the plaintiff failed to establish by a preponderance of the evidence that personal injury was sustained by him as an employee of the defendant by an accident arising out of and in the course of his employment.

For convenience we will refer to the appellant as Gilbert or claimant, and the appellee, Metropolitan Utilities District, as district.

With reference to the first assignment of error, section 48-133, R. R. S. 1943, provides: "No proceeding for compensation for an injury under this act shall be maintained unless a notice of the injury shall have been given to the employer as soon as practicable after the happening thereof, and unless the claim for compensation with respect to such injury shall have been made within six months after the occurrence of the same, * * *."

Section 48-137, R. R. S. 1943, provides: "In case of personal injury, all claim for compensation shall be forever barred unless, within one year after the accident, the parties shall have agreed upon the compensation payable under this act, or unless, within one year after the accident, one of the parties shall have filed a petition as provided in section 48-173."

The claimant filed a petition in the Nebraska Workmen's Compensation Court within a year, as provided for in the above section.

The requirement of section 48-133, R. R. S. 1943, that a claim for compensation must be made within 6 months after the occurrence of an injury, has been held to be a condition precedent to a right of action under the workmen's compensation law. Park v. School District, 127 Neb. 767, 257 N. W. 219.

The claimant relies on Schmidt v. City of Lincoln, 137 Neb. 546, 290 N. W. 250, wherein it was said: "Medical expenses are compensation rights within the meaning

of the workmen's compensation law (Baade v. Omaha
Flour Mills Co., 118 Neb. 445, 225 N. W. 117), and a
demand for payment of medical expenses is necessarily
a claim for compensation, where it is made under such
circumstances as to manifest an intention to claim the
benefits of the statute. Giving to the compensation
law the liberal construction to which it is entitled, we
must accordingly hold that, where a claim for any com-
pensation benefits is made within six months after the
occurrence of an injury, this is sufficient to support
the employee's right to institute proceedings within a
year, to recover every benefit which has then accrued
under the law." See, also, New Staunton Coal Co. v.
Industrial Commission, 304 Ill. 613, 136 N. E. 782; Aiello
v. Ford Motor Co., 273 Mich. 15, 262 N. W. 726.

In the instant case the claimant testified that he was
involved in an accident arising out of and in the course
of his employment on Friday, June 9, 1950. He worked
on Saturday, and was off work Sunday and Monday,
Monday being his regular day off. When he returned
to work, and on about June 15, 1950, he notified Mr.
Laushman, assistant supervisor of the service department
in which claimant was employed, informed him of the
manner in which he was injured, and requested the
services of a doctor. This request was delayed until
the safety engineer, Earl Frederickson, could be con-
tacted. He was contacted and noticed that the claimant
was suffering some physical difficulty and sent him to
Dr. Swenson. At that time Frederickson took an oral
statement from the claimant, summed up what the
claimant had told him, and this was reduced to writ-
ing as follows: "We were going to bring an old heavy
Roper Stove into the shop. The stove was in a dinning
room at 1024 Edwards Street. Mueller and Krammer
were with me. We were starting to lift the stove when
it seemed that the end I had a hold of went up too
quick. A pain shot down from my left hip down through

my leg. I said, 'Blank - Blank that hurts'. It felt like my leg was torn.

"This accident happened Friday, June 9th, about 2:30 or 3:00 P. M. Saturday it bothered me a little but I didn't pay any attention to it. Sunday and Monday I stayed in bed and put hot packs on it. I reported the accident Tuesday to Mr. B. Schulte. Tuesday and Wednesday nights I could hardly sleep. This morning I reported to Mr. Laushman who sent me to the Personnel Office." This statement was dated June 15, 1950, and was unsigned. It appears that B. Schulte was an employee in the office.

Dr. Swenson, a district-recommended doctor, was contacted at Clarkson Hospital, and after an examination and treatment, he recommended that the claimant contact Drs. Keegan and Finlayson, district-recommended doctors, which the claimant did and was examined by Dr. Finlayson. The details of the examination of the doctors will be more fully covered later in the opinion.

The district contends that the claimant never made a claim for compensation, and that the claimant so testified in the compensation court.

In Schmidt v. City of Lincoln, *supra*, the employee Schmidt made a demand upon the city within 3 weeks after the accident that the city pay a doctor bill for services rendered the employee by his family physician. This was the only claim made by Schmidt for compensation, and the action was not commenced until nearly a year after the accident. The court said: "It is not necessary for the employee to specify the extent of the benefits to which he thinks himself entitled, and unless he attempts to conceal the scope of his rights for the purpose of misleading the employer, and the employer is in fact prejudiced thereby, the requirement of the statute is sufficiently met by a claim or demand for any compensation right, sufficient to advise the employer of his intention to bring the injury under the statute and to avail himself of its provisions."

The assistant supervisor of the department in which the claimant worked and the safety engineer, as disclosed by the record, were the proper parties to whom the necessary claim or demand for compensation should be made. The claimant so notified his superior officers of the accident and his demand for medical services. The claimant was under treatment for more than 6 months, and the injury at that time had not reached its maximum effect upon his body.

The distinction between the case of Schmidt v. City of Lincoln, *supra,* and the instant case is that in the cited case the employee made a demand that the services of his family doctor rendered for him be paid by the city, while in the instant case the claimant was treated by district-recommended doctors who were paid by the district.

The record shows that the claimant gave notice to his immediate superiors as soon as practicable after the accident occurred, and made demand for medical attention, which he received. In this connection the following authorities are applicable, insofar as giving notice of injury to the employer and making claim for compensation is concerned, as provided for by section 48-133, R. R. S. 1943.

In the case of Aiello v. Ford Motor Co., *supra,* it was held that where an employee complained of an eye injury to his foreman and was sent to his company doctor who sent him to company hospital, this was sufficient evidence of notice of injury to comply with the statute, and sufficient to sustain a finding of the department of labor and industry that the employer received unequivocal claim for compensation.

In Royal Indemnity Co. v. Industrial Commission, 88 Colo. 113, 293 P. 342, it was held that payment for medical treatment of an accidental injury of an employee by his employer makes the giving of notice of the accident within the statutory 6 months unnecessary. The court said: "The day after the accident the em-

ployer engaged a doctor to examine and treat the claimant's left eye, and for nearly two weeks the claimant received medical treatment at the expense of the employer. This constituted the receipt of compensation within the meaning of the statute, and dispensed with the necessity of giving notice within six months. Industrial Commission v. Globe Indemnity Co., 74 Colo. 52, 218 Pac. 910."

In Seaman Body Corp. v. Industrial Commission, 209 Wis. 321, 245 N. W. 68, it was held that where an employee claimed to have suffered injuries as a result of an accident arising out of and in the course of his employment and requested the employer's doctor for medical aid within 30 days from the date of the injury, such request constituted actual notice of injury to the employer. See, also, Oklahoma Furniture Mfg. Co. v. Nolen, 164 Okl. 213, 23 P. 2d 381; Pittman v. Glencliff Dairy Products Co., 154 Kan. 516, 119 P. 2d 470, 144 A. L. R. 600; Annotation, 144 A. L. R. 617.

Baade v. Omaha Flour Mills Co., 118 Neb. 445, 225 N. W. 117, is cited, which held: "Where an employer furnishes medical, surgical, and hospital services to an employee, * * * the payments therefor constitute payment of compensation within the meaning of the employers' liability act."

We hold that the claimant made sufficient compliance with section 48-133, R. R. S. 1943, to warrant this court in holding that a claim for compensation was made within 6 months after the occurrence of the accident, as contemplated by said statute.

This brings us to the question of whether or not the plaintiff sustained an "accident" as that word is defined in subdivision (2) of section 48-151, R. R. S. 1943, reading as follows: "The word 'accident' as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and producing at the time ob-

jective symptoms of an injury." See, also, Tucker v. Paxton & Gallagher Co., 153 Neb. 1, 43 N. W. 2d 522; Foster v. Atlas Lumber Co., 155 Neb. 129, 50 N. W. 2d 637.

In conjunction with the foregoing, the burden of proof is upon the claimant in a compensation case to establish by a preponderance of the evidence that personal injury was sustained by the employee by an accident arising out of and in the course of his employment. See, Beam v. Goodyear Tire & Rubber Co., 152 Neb. 663, 42 N. W. 2d 293; McCoy v. Gooch Milling & Elevator Co., *ante* p. 95, 54 N. W. 2d 373.

"On any appeal to this court in a workmen's compensation case the cause will be here considered de novo upon the record." Beam v. Goodyear Tire & Rubber Co., *supra.* See, also, McCoy v. Gooch Milling & Elevator Co., *supra.*

With the foregoing authorities in mind, we proceed to the record to determine whether or not the claimant has made a case under the Workmen's Compensation Act.

The record discloses that William Gilbert has been employed by the district for a period of more than 10 years. At the time of trial he was classified as senior mechanic-fitter. His duties included everything in the service line, such as installing gas ranges, refrigerators, heaters, and commercial heaters. On June 9, 1950, he and two other employees of the district, Mueller and Kramer, were engaged in delivering a new gas range to 1024 Edwards Street in Omaha. The old range, which, weighed about 300 pounds, was disconnected and shoved into another room. The new range was brought from the truck into the house and connected. In handling and lifting ranges, when about to lift the range those engaged in lifting would generally state when they were ready. In lifting the old range to carry it to the truck, Mueller and Kramer were on the heavier end of the range and Gilbert was on the lighter end. When they started to lift this range Gilbert was in a stooped posi-

tion, and when the range was being lifted straight up his feet were placed solidly on the floor and he had his hands on the range. He could not estimate how far off the floor it was when it wabbled and gave a lurch, or a jerk, sidewise and caught him over-balanced. He felt a sharp, severe pain run down through his left leg.

Mueller testified that in picking up the old range either he or Kramer lifted it too much, one of them lagged a little, and the weight shifted to one side on Gilbert. The range had been lifted from 6 inches to a foot from the floor when Gilbert complained of a pain in his back and left leg, and this was when the range gave a lurch.

Kramer testified that "in the process of lifting up the stove it seemed to wabble around. * * * It must have been off balance, or something was wrong and it wabbled." He further testified that he believed Gilbert had the same weight to support as the other two. Gilbert made an outcry and exclaimed "Oh, my back." They continued to carry the range to the truck which was 25 to 30 feet distant from where they lifted the range and in such a position that all that was necessary was to slide the range onto the truck. Gilbert and Kramer took the range to the storehouse at Nineteenth and Center Streets. Gilbert drove the truck. When they arrived at the storehouse the truck was backed up to the dock. Kramer got on the outside and lifted the range up onto the dock where they slid it along. Kramer estimated that he lifted it not quite a foot off the truck, and testified that Gilbert helped to lift it a little. Kramer observed Gilbert's appearance; he seemed to be suffering and experiencing pain.

Gilbert testified that his pain was so severe when they got to the shop that he was unable to lift his end of the range, and had to let it down; that, in fact, the range only had to be lifted 3 or 4 inches; and that Kramer had to lift the range and shove it out of the truck onto the dock.

Gilbert and the other two witnesses testified that they endeavored to lift and move the range as they ordinarily and customarily would do by lifting it bodily.

This happened on Friday, June 9, 1950. Gilbert worked on Saturday, but did no lifting. He was off work Sunday, and Monday was his regular day off. He felt that the pain would leave, but he took care of himself Sunday and Monday by applying hot packs to his injuries, and when he returned after the weekend he notified Laushman, assistant supervisor of the service department, and told him he had to see a doctor. A report was made out by Mr. Frederickson, the safety engineer. He was sent to contact Frederickson because he insisted upon seeing a doctor. Frederickson noticed that he had some trouble with his leg, and arrangements were made to send him to Dr. Swenson who was contacted at the Clarkson Hospital. When Gilbert arrived at the hospital, Dr. Swenson turned him around and struck him in the small of the back, took him into an emergency room, and applied other tests. He taped Gilbert's back and said he could not do much, but wanted to see him in a day or two. The pain did not leave, and when Gilbert next saw Dr. Swenson, he was sent to Drs. Keegan and Finlayson.

Dr. Swenson saw Gilbert on June 15, 1950, at which time Gilbert gave him a history that 6 or 8 years previously he was installing a heater at Thirtieth and Dodge Streets. At the time he was lifting the heater he had severe pain, was almost paralyzed, and was off work for 3 or 4 days. He had no more trouble with his back until June 9, 1950, when lifting a stove at 1024 Edwards Street, the stove slipped, twisting his back. He had pain in the left low back region going down the back of his left leg. At that time the doctor taped his back. It was recommended that he go to Drs. Keegan and Finlayson.

Dr. Finlayson examined the claimant on June 16, 1950,

at which time Gilbert gave him the following history, in substance: That 6 or 8 years previously, while he was putting up a unit heater weighing about 500 pounds, he twisted his neck, developing pain in his neck and down his back. He was hospitalized, and was off work 3 or 4 days. Since that time he has had some low back pain whenever he performed lifting. On June 9, 1950, while lifting an old, heavy, Roper stove, he developed sudden sharp pain in the left side of the low back radiating down the hip, posterior thigh and into the calf. He noticed no tingling or numbness in the leg or foot. He stated that he was unable to find any com-fortable position in bed except to lie face down with his legs out straight, and that he felt more comfortable walking than he did sitting. Examination revealed his back to be taped with adhesive tape, limited three plus in flexion but extension free. The doctor applied certain tests, and his impression was that "Mr. Gilbert has an acute lumbo-sacral disc herniation with compression of the left first sacral nerve root, which is probably surgical. The patient was not willing to consider surgery at that time and x-rays were not obtained. These should be obtained if he decides in favor of surgery, but re-examination would also be required. Good prospect of relief seems reasonable to expect."

After Gilbert left the offices of Drs. Keegan and Finlayson, he called on his family physician, Dr. Thomas D. Bolar, who had attended him in 1944, when he complained of an injury to his neck, at which time X-rays were taken and found negative. Dr. Bolar was consulted by Gilbert with reference to the injury of June 9, 1950. Dr. Bolar, not being engaged in that kind of medical work, referred him to Dr. Joseph F. Gross.

Dr. Joseph F. Gross testified that he first saw Gilbert on June 19, 1950. At that time Gilbert gave him the history that he was lifting a stove and someone slipped. He sustained severe pain in the back which radiated down the left leg. The examination disclosed marked

muscle spasm in the back. There was approximately 75 percent limitation of motion of the back in all directions. He had a flat lumbar curve. His back was not normally kinked the way it should be, but due to the muscle spasm was straight up and down. His straight-leg test, which was used for the determination of the presence or absence of disk pathology, was positive on his left side, indicating that he had a lesion which was irritating the sciatic nerve at one of its nerve roots. He also had a dermatome in the area of numbness of one limb, which would localize a local lesion in the back affecting a nerve root. He also had a weak ankle jerk on the left side, again indicating nerve root or disk pathology. Since this lesion was acute and severe, the doctor chose to treat him conservatively, putting a brace on him, some light, and heat. However, after a sufficient length of time, probably 2 or 3 months, he still had a positive disk finding. He was not any better. Surgery was advised, but the patient did not desire it. The doctor followed him along intermittently from then until August 15, 1951. His examination at that time was essentially the same as the first time. Gilbert still had a muscle spasm and the neurological findings indicating a disk. The doctor reiterated his diagnosis made the first time, that he did have a disk on his left side between the fourth and fifth lumbar vertebra. He fixed the disability equation at 30 percent, and concluded the accident in lifting the stove was the cause of the herniation of the disk.

Dr. Swenson saw Gilbert again on February 23, 1951, when Gilbert gave the same history, and the doctor was under the impression that Gilbert's condition was caused by a ruptured disk. He made out a regular form report to the district in which he stated that Gilbert's condition was due to an injury, and wholly to an accident; that the injury was not aggravated by any cause or chronic condition, which means previous con-

dition; and that he based his conclusion upon the history furnished by Gilbert.

It appears also that Dr. James F. Kelly made a report to Dr. Gross with reference to X-rays taken of Gilbert, in which report he stated: "There is anterior lipping about the body of the 4th lumbar vertebra indicative of early localized arthritic change. No other significant changes are noted in the lumbar spine, sacroiliac or hip areas."

Dr. Gross testified it was not unusual to find localized lipping of adjacent vertebra at the level of a ruptured disk, and such condition as found by Dr. Kelly was not of sufficient importance to cause pain in the back. He further testified: "Anterior lipping of the body of the vertebra is the solid spot upon which the spine is built, and on which the disks are placed, and we have lipping, we have little spurs, the new bone forms, coming off of the front of it." He further testified that while Gilbert complained of pain in his left leg, that is where it hurts, but his disability comes from his back and is projected to his leg through his nervous system; that he would feel a herniated disk immediately, as was found in this case; and that it was possible that under the circumtances he could have continued to help carry the old range to the truck.

Dr. W. R. Hamsa first saw Gilbert on July 23, 1951, at the request of the district, to make an examination. Gilbert gave him a history in substance as follows: In June 1950, while lifting a stove he experienced immediate pain in the back of his left leg which lasted 2 or 3 weeks, and was aggravated by coughing or sneezing. He saw Dr. Swenson the second or third day, had his back taped, and was then subsequently referred to Drs. Keegan and Finlayson for opinion. He stated that in 1944, while lifting a ceiling heater he experienced a paralyzing sensation, described it in his arms and legs, at which time he was seen by Dr. Bolar, who kept him in St. Catherines Hospital for 1 day, and from which

condition he seemed to recover in 4 or 5 days' time. Dr.
Hamsa's examination showed muscle pull posteriorly
with a somewhat obese abdomen, prominent. He was
wearing a chairback type of brace which fitted well.
The legs were of equal length. The right calf was ½
inch larger, as would be expected in a right handed in-
dividual. The spine muscles showed one-third normal
flexion; extension, that is bending forward and back-
ward, causing sacrolumbar pain. Side bending and
twisting was 50 percent normal, and each caused the
same low back pain. Chest expansion was 2½ inches;
the arms and legs were free. Straight leg raising was
possible to 60 degrees on the right side, caused him low
back pain and sciatic pain in the left side. The same
straight leg could only be brought up 30 degrees on the
left side, causing the same pain. He had definite de-
crease in pain sensation over the left hip, thigh, and
calf, running into the outer border of the foot. There
was no muscle spasm. His reflexes were normal. Ten-
derness to pressure was present only over the sacrolum-
bar joint and over both sides of that joint, as well as
over the long back muscles on either side of the spine.
He saw Gilbert again on January 8, 1952. His history
at that time was that the pain in his left leg was the
same. It was worse if he was sitting, if he lifted, or
coughed. His back, if he was standing, had numbness
down the leg into the calf, and ached if he sat too long.
The brace was used and relieved him. He had no par-
ticular back pain. His general condition was good.
His weight was 200 pounds. As to the disability equa-
tion to the body as a whole it would be 15 percent, and
if proper treatment was applied there could be further
recovery. The 15 percent would include disability,
if any, that he might have had as a result of his previous
injury in 1944. With reference to the X-ray pictures
taken by Dr. Kelly, an old injury was indicated. This
would cause some back pain, but no sensation of pain in
the left leg. This doctor felt that Gilbert had a definite

first sacrum nerve root pressure on the left side, possibly due to a disk protrusion between the fifth lumbar and first sacrum. In answer to a hypothetical question involving the lifting of the stove, its weight, and the pain endured, his opinion would be that there was a herniated disk, and it was recommended that he should do no heavy lifting.

An employee of the district was with Gilbert at the time of the injury received by Gilbert in 1944. His testimony was to the effect that Gilbert complained of pain in his back at different times due to this injury which occurred when he was putting up a ceiling heater with the assistance of four employees. Gilbert slipped off a box and hurt his back. He was off work for a few days, and complained of pain when he came back to work.

It appears from the testimony that the injury received by Gilbert in 1944 was not a back injury, but rather an injury to his neck. This fact developed in the history given to Dr. Finlayson by Gilbert, and also from the testimony of Dr. Bolar who treated him for that injury and testified that it was a neck injury. It is apparent from the evidence that the previous injury suffered by Gilbert in 1944 was not aggravated or accelerated by the injury which he received on June 9, 1950, and, in fact, had no connection with the latter injury. Gilbert's claim for compensation in the instant case is based on the injury he received on June 9, 1950, and no other injury.

Other testimony is to the effect that one of Gilbert's superiors talked to him about employment other than that which he was engaged in, where no heavy lifting would have to be done by him. However, Gilbert preferred to do the kind of work he was accustomed to, and thought he could do it with the aid and assistance of a helper. He has been working at the same kind of employment ever since except that he does no heavy lifting and has not been required to do heavy lifting

since the accident. He is furnished a helper. He lost no time from work by virtue of the injury received on June 9, 1950. He has been continuously employed by the district, and received the benefit of two wage raises the same as other employees of the district. At the time of trial he still felt some pain in his left leg.

The district contends that the evidence was insufficient to show by a preponderance thereof, or with reasonable certainty, that Gilbert sustained an accident which arose out of and in the course of his employment, but, contra, shows that the range was moved in the ordinary and customary manner, and the exertion on the part of Gilbert was that which was ordinarily incident to his employment. We are not in accord with the district's contention in such respect.

We conclude, from an analysis of the record, that the claimant Gilbert was injured in an accident which arose out of and in the course of his employment as the term "accident" is defined in section 48-151, R. R. S. 1943, and by virtue thereof, suffered a 25 percent permanent partial disability and is entitled to compensation at the rate of $9.54 a week for a period of 300 weeks from and after June 9, 1950, to be paid by his employer, the Metropolitan Utilities District.

The district contends that in the event the claimant would be entitled to compensation for disability, such disability is confined entirely to his left leg, and compensation would be limited to specific loss of use of his left leg under subdivision (3) of section 48-121, R. R. S. 1943. It is true that the claimant complained of pain in his left leg. However, as disclosed by the testimony of Dr. Gross and as indicated by the testimony of other doctors, while he complained of pain in his left leg, the disability was to the back and is projected through his nervous system which caused the pain in the left leg. The contention of the district in this respect is without merit.

We conclude that the judgment of the trial court

should be reversed and the cause remanded with directions to enter judgment in conformity with this opinion.

REVERSED AND REMANDED . WITH DIRECTIONS.