ELLA HAMILTON, APPELLEE, V. FRED HUEBNER, DOING BUSINESS UNDER THE FIRM NAME AND STYLE OF VAN SUPER SERVICE, ET AL., APPELLANTS.

19 N. W. 2d 552

FILED JULY 6, 1945. No. 31939.

FREDERICK M. DEUTSCH, for appellants.

*Moyer & Moyer*, for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

SIMMONS, C. J.

Plaintiff here seeks an award of compensation under the Workmen's Compensation Act. Her claim was denied by one of the judges of the compensation court. Rehearing was waived. Appeal was taken to and trial had in the district court, where an award was entered granting compensation. Defendants appeal. We reverse the judgment of the district court and dismiss the action.

Plaintiff is the widow of Earl T. Hamilton. The defendants are his employer and the insurance carrier.

Plaintiff filed her petition in the compensation court, alleging the employment of Hamilton, the nature of his employment and his wages. She further alleged that he received injuries arising out of and in the course of his employment; and that he died from the effects of the injuries. She prayed for compensation.

Defendants answered admitting the employment, the wages, and the death of Hamilton, and denying other allegations of the petition.

The matter was heard before one judge of the compensation court who found that the death did not result from an accident arising out of and in the course of the employment, and dismissed the petition. Plaintiff waived a rehearing and elected to appeal directly to the district court. Trial was had in the district court, resulting in a finding generally for the plaintiff. An award of compensation, medical, hospital and burial expense was made. A motion for a new trial was made and denied. Defendants appeal.

Defendants assign as error the following: That the evidence did not support the award and it was contrary thereto; that the court erred in ruling upon, and in the admission of, evidence in several particulars; that the court erred in its findings; and that the compensation award was excessive.

In summarizing the evidence, as it appears in the record, we include that which was admitted over objection of the defendants.

Defendant Huebner, hereinafter called the defendant,

operated a gasoline filling station, tire and battery shop, and related businesses. He operated trucks for the delivery of petroleum products. His establishment covered about one-fourth of a city block. On this location he had a filling station, an office, a tire and battery shop, and a garage for the storage of vehicles.

Deceased was 45 years of age, and up to the time of the events here involved apparently was in good health. He had worked for defendant for several years. His duties were primarily in the tire and battery shop, changing and repairing car, truck and tractor tires, tubes and batteries. He occasionally worked on the pumps and did other work about the establishment.

On one of defendant's trucks there was a small one to one and one-half horsepower four-cycle engine, similar to those used on some washing machines. This was mounted about four feet above the ground. Its function was to operate the device that measured the product delivered from the truck. The starting apparatus was a pulley, similar to that on an outboard motor, except that the pulley was mounted vertically on the side. The method of starting was also similar to the outboard motor operation. The pulley cord was sash-weight cord, from 30 to 36 inches in length, with a wooden handle on one end and a knot on the other. In starting the engine, about two feet of this cord were wrapped about the pulley and then pulled or jerked, the operator standing in front of the engine and pulling with the force away from it. It was not necessary that the person exerting the force assume a cramped or awkward position. The force necessary to turn the engine was much less than that used in cranking a small automobile engine. Normally this engine could be turned over against compression by taking hold of the starting pulley with one hand. Sustained force was not required, i. e., there was the pull, and if the engine did not start, then a rewind of the cord on the pulley and another pull were necessary. The cords became worn in this process and often broke at the frayed places.

Defendant's employee, Sellentine, operated this truck.

On the evening of October 18, 1943, the engine had failed to work. Deceased and Sellentine had spent some time late that day attempting to start it, but were unsuccessful. Defendant told Sellentine to take it to a garage the following morning to be fixed.

The truck was located about 125 feet from the filling station. On the morning of October 19, 1943, at about 8:00 o'clock, contrary to that instruction, deceased and Sellentine again attempted to start the engine, but were unsuccessful. They worked at it some minutes taking turns at pulling on the cord. Sellentine then returned to the pump. Some 15 or 20 minutes later deceased came to Sellentine at the station and told him the rope had broken. The two men returned to the truck, Sellentine got a new cord, attached the handle and went back to the station. Some 30 minutes later, or about 9:00 a. m., deceased came again to the station, said he had been unable to start the engine, suggested it be taken to the garage, and remarked that he had a severe pain in his chest. He made no statement of any untoward event or accident. He asked for no assistance. His appearance did not cause alarm to Sellentine, who then left with the truck for the garage.

Apparently a few minutes later, a tire company representative, who was acquainted with deceased, went into the tire shop. This building was about 75 feet from the station. There was nothing unusual about deceased's condition, except he was sitting down during working hours. This caused the representative to ask deceased what was the matter. He replied that he had a severe pain in the chest, and that he had been cranking a motor. It appears that in his testimony before the compensation commissioner, he stated deceased also said that the rope broke. Deceased asked for no help and his condition did not cause the tire representative any concern.

Deceased lived less than a block away across the street. He next appeared at his home sometime between 9:00 and 10:00 a. m. He entered the house, took off his cap and jacket, pounded his chest, remarked to plaintiff that he had

a terrible pain in his chest and that it was driving him crazy. He walked the floor, his face was white, and he appeared to be suffering intense pain. Plaintiff called the doctor. Plaintiff on direct examination was asked this question: "Did you make any inquiry or did he tell you what he had been doing or what had happened to him?" Objection was made based on incompetency, irrelevancy, immateriality and hearsay. The objection was overruled. Plaintiff gave this answer: "Yes. He said he had been working with a motor over at the station and when the rope broke he said 'I slipped and got a terrible jolt.'" This statement as to what deceased said was repeated in the evidence a number of times. Plaintiff also testified deceased said the pain came on immediately after the rope broke.

The doctor appeared in some 15 or 20 minutes. He examined deceased and found him in much pain, jittery, breathing with difficulty and ashen in color. He was able to talk. The doctor obtained a history. As a part of his history, deceased told the physician: "He said he was trying to start an engine and had worked something like an hour of (sic) maybe longer, I forget the exact time, he said the engine started with a rope and the rope broke and he fell to the ground quite hard and he was unable to work any more." He further stated that he suffered acute pain very shortly thereafter. This evidence was admitted over objection. The doctor diagnosed the illness as acute coronary thrombosis. Deceased died from that cause on November 21, 1943.

Plaintiff relies upon the testimony of her expert witness to sustain her claim that deceased died as a result of personal injuries received out of and in the course of his employment.

The doctor was asked if the *fall* which deceased had while he was working on the motor, and resulting from the breaking of the rope, had any direct connection with the thrombosis. He answered that "It could" by causing the arteriosclerotic material to become loosened and block the vessel, and stated that thromboses are known to have been caused

by trauma. He then was asked a hypothetical question which included the elements that deceased was working on the motor and while so engaged a rope which he was using broke and he fell heavily to the ground, and was asked to state what in his opinion produced the thrombosis. The doctor replied that it would look to him as though the deceased had an arteriosclerotic condition of his vessels and that "the exertion of cranking the motor and then the fall, the exertion set the condition from increased blood pressure, and then the fall tearing the sclerotic lining of the vessel loose, the force of the blood stream blocked the vessel." He further testified that in his opinion, and as the extent of his testimony, the thrombosis suffered by deceased resulted from two things—the exertion in attempting to start the motor, plus the fall or trauma. He further testified that there was no way to determine, in the absence of those elements, whether or not deceased would have sustained the thrombosis.

On cross-examination, the expert stated that the thrombosis could have been the result of a condition brought on by arteriosclerosis, or by mitral vegetation of the heart valves, or by a blood clot in the aortic region descending through the coronary artery, and that he premised his conclusion given on direct examination on the existence of arteriosclerosis. He testified that there is no way for any one to tell definitely, except by autopsy, and that it is pretty much a guess, what brings about a coronary thrombosis. He further testified that he would not expect a seizure, such as deceased had, to come on without overexertion, but that he would not say it would not happen; that it was a matter of conjecture; and that the doing of the things deceased was supposed to have done could have been a coincidence.

On redirect examination, he testified that in his opinion the coronary thrombosis in this case was caused by the exertion and the fall, because "it could be", and that a sudden jar and force in the vicinity of the heart "could" cause the breaking off of the diseased tissue and "could" subsequently result in a thrombosis.

We have many times held that an award of compensation cannot be sustained if based upon possibilities, probabilities, conjectural or speculative evidence. *Williams v. Watson Bros. Transportation Co.*, 145 Neb.466, 16 N. W..2d 199.

However, viewing the expert evidence in its most favorable light to the plaintiff, it is quite apparent that the expert premised his conclusions upon the existence of two fact elements, an overexertion and a fall.

We recently have held: "The value of the opinion of an expert witness is dependent on, and is no stronger than, the facts on which it is predicated. The opinion has no probative force unless the premises upon which it is based are shown to be true." *Williams v. Watson Bros. Transportation Co., supra.* The question then is: Are the elements of overexertion and a fall shown to be true?

There appears to be no question but that the starter rope broke. A part of the broken rope is in evidence. It is two feet long. About four inches from the broken end there is a frayed place where the rope is worn more than half through, sustaining the testimony of a witness that these ropes break from wear near the end attached to the pulley, and not from force. But as to the rope plaintiff's expert witness testified that he would not say the breaking of it especially caused the thrombosis. "I do not see how the breaking of the rope could do it; it is only a factor. If he had extreme exertion that may have added to it."

There is no evidence in this record of any overexertion or of any particular amount of exertion in the work of attempting to start this engine. It does not appear that the deceased told the doctor of any overexertion. The testimony in the record as to the method of starting this engine, the short pull or jerk followed by a pause and rewinding, the small amount of force necessary in the process, all negative any inference or conclusion that there was or could have been any overexertion. Mere exertion, which is not greater than that ordinarily incident to the employment, which combined with pre-existing disease produces disability, does not constitute a compensable accidental injury. *Gilkeson*

*v. Northern Gas Engineering Co.,* 127 Neb. 124, 254 N. W. 714; *Shamp v. Landy Clark Co.,* 134 Neb. 73, 277 N. W. 802; *Rose v. City of Fairmont,* 140 Neb. 550, 300 N. W. 574; *Brown v. City of Omaha,* 141 Neb. 587, 4 N. W. 2d 564.

Is there competent evidence to sustain a finding of a fall? It is noted that the deceased, when telling his fellow employee of the breaking of the rope, of his failure to start the engine and of his pain, made no reference to a fall, a jolt, or other unusual happening. Neither did he mention a fall or a jolt to the tire representative when he told of trying to start the engine and of his pain. These were the people to whom he first spoke after the alleged accident. The only testimony upon which the finding of a fall can be based appears in the statements made to the plaintiff and to the doctor. The plaintiff in her testimony does not say that the deceased told her of a fall, but of a slip and a "terrible jolt." The doctor testified that deceased said he had a hard fall to the ground. Plaintiff testified that her husband told the doctor that "when that rope broke he slipped and got a terrible jolt." Defendants objected to the introduction of this evidence as hearsay, and incompetent. As to the doctor's testimony, the defendants do not debate its admissibility as a history given for the purpose of diagnosis and treatment, but contend that it is hearsay and incompetent to prove the happening of the fact. Plaintiff submits that the statements are admissible as a part of the *res gestæ.* We go to that question.

The statements here considered are not offered solely to prove that the assertions were made, but to prove that the assertions made are facts. The facts sought to be proved here by these assertions are that the deceased in attempting to start the motor slipped and had a terrible jolt or a hard fall to the ground. The statements of the deceased were not made under oath, and not subject to the test of cross-examination which might establish or destroy their probative value.

There is a distinct difference between an extrajudicial statement offered to prove that it was in fact made and such

statement when offered to prove that the statement as made is in truth a fact.

The hearsay rule forbids the use of an assertion, made out of court, as testimony to establish the truth of the fact asserted, unless the circumstances under which the statement was made are such as to justify the waiver of the requirement that it be given under oath and subject to cross-examination. There are exceptions to the hearsay rule which permit such a statement to be submitted to the triers of fact for their determination of its probative value. These circumstances are such as add a degree of trustworthiness to a statement more than that which can ordinarily be attached to an extrajudicial assertion.

The competency of each statement must be weighed and determined in the light of the particular circumstances under which it was made. Due to the variable circumstances arising in each case, any attempt to base a decision on fact precedent is largely futile. There are a multitude of cases dealing with the subject and exhaustive discussions in the texts. We do not undertake an attempt to rationalize the decisions of the courts. Reference is made to 6 Wigmore, Evidence (3d ed.), ch. LIX, p. 131, and ch. LX, p. 177; 3 Jones, Commentaries on Evidence (2d ed.), ch. 12, p. 2186; Chamberlayne, Trial Evidence (2d ed.), ch. XXXVIII, p. 751.

This court has considered the rule in many cases. The last statement, which we have followed since, is found in *Tongue v. Perrigo*, 130 Neb. 564, 265 N. W. 737: "A statement to be admissible as a part of the *res gestæ* must have been spontaneous and impulsive, and made at a time and under such circumstances as to induce the belief that it was not the result of reflection and premeditation." The rule has been stated in varying language in other cases, such as *Missouri P. R. Co. v. Baier*, 37 Neb. 235, 55 N. W. 913; *Collins v. State*, 46 Neb. 37, 64 N. W. 432; *City of Friend v. Burleigh*, 53 Neb. 674, 74 N. W. 50; *Pledger v. Chicago, B. & Q. Ry. Co.*, 69 Neb. 456, 95 N. W. 1057; and *Milton v. City of Gordon*, 129 Neb. 888, 263 N. W. 208.

The Circuit Court of Appeals, Fourth Circuit, in *Chesapeake & O. Ry. Co. v. Mears,* 64 F. 2d 291, discussed the authorities, cited Wigmore, *supra,* sec. 1750, and held that to. render such statements admissible it was required that " (1) There be some shock to the feelings sufficient to render the utterance spontaneous and unreflecting; (2) 'the utterance must have been before there has been time to contrive and misrepresent, i. e. while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance'; and (3) it must relate to the circumstance causing the shock to the feelings." The court further said: "While a logical basis is not always given for the decisions, the cases almost uniformly hold that a statement made by an injured person as to the cause of his injury is admissible if the time which has elapsed since the injury is so short that he is still under the influence of the happening and his statement presumptively a spontaneous expression growing out of it and not the result of reason and reflection."

The mathematical elapsed time between the happening of the event and the making of the statement is not alone decisive. We have held: "A declaration, to be a part of the *res gestæ,* need not necessarily be coincident in point of time with the main fact proved. It is enough that the two are so clearly connected that the declaration can, in the ordinary course of affairs, be said to be a spontaneous explanation of the real cause." *Missouri P. R. Co. v. Baier, supra.*

Statements made subsequent to the act may be admissible provided there has not been time for the exciting influence of the shock to lose its sway and be dissipated, or; as stated otherwise, provided the shock extends from the moment of the event to the time the statement is made. See 6 Wigmore, Evidence (3d ed.), sec. 1750, p. 142.

It is not enough that the speaker was under the stress of nervous excitement or pain when the statement was made, but it must appear that the speaker was under the stress of nervous excitement and shock produced by the act in issue. See *Keefe v. State,* 50 Ariz. 293, 72 P. 2d 425.

Tested by these rules, and for the following reasons, we are of the opinion that the offered statements were incompetent to prove the fact of a severe jolt or fall, and that the trial court should not have considered, and that we should not consider, them as proof of the fact in issue. There is no evidence here that the deceased suffered a shock as a result of the alleged accident. The testimony of the two men to whom he first talked after the alleged accident negatives any shock or excitement. It is true that when he made the statements to the plaintiff and to the doctor he was under considerable stress and pain, but that stress was not caused by an accident but by the pain and physical condition resulting from the thrombosis; it was not a stress produced by the act in issue. Likewise, it is clear that the statements were not spontaneous and unreflected and involuntary. They are a narrative of past events in form and substance. The plaintiff testified that deceased made the statement to her after she had asked him what had happened. He made the statement to the doctor as a part of the history of his case. The statements were made after his reflective powers were called into action and as a result of that fact.

It necessarily follows that plaintiff's case fails of competent proof to show that an accident, to wit: A severe jolt or hard fall, was actually had by the deceased. It further follows that the testimony of plaintiff's expert witness has no probative force because the premises of fact upon which it is based are not shown to be true.

One further matter requires attention. It was argued to the trial court and here that in compensation cases a liberal policy should be followed in the admission of declarations as a part of the *res gestæ,* for the reason, as the trial court stated in a memorandum opinion, citing *Jacobs v. Village of Buhl,* 199 Minn. 572, 273 N. W. 245: "Otherwise there could be no compensation award for the death of employees who sustain injuries in the absence of eye-witnesses, and the beneficient purposes of the Workmen's Compensation Act would be unavailable to their widows." The reasoning in the Minnesota case is stated as follows: "Perhaps a liberal

interpretation of the rule of *res gestæ* may in a few cases result in giving compensation to dependents not legally entitled thereto, but a technical and strict administration of the rule would defeat many meritorious cases and transfer numerous dependents from industry upon which the compensation law intends to put the burden, to public charity."

We also are cited in the brief to the case of *Johnston v. Payne-Yost Construction Co.*, 292 Pa. St. 509, 141 Atl. 481, where the court acted upon a similar line of reasoning. Without undertaking to point out obvious distinctions between these cases and the case at bar, we do point out that the Minnesota court found competent evidence in the record other than the hearsay statement to support a finding that an accident occurred. In the Pennsylvania case, the court said: " * * * even in compensation cases, the material findings must have a basis of legal proof on which to rest, and may not be based on hearsay alone" and that they would not classify border-line evidence as entirely incompetent where, as in the case then being considered, " * * * unquestionably competent proofs indicate the probability of the fact at issue being as stated in such border-line testimony * *. * ." These cases seem in the final analysis to get back to the proposition that the question of the competency of such statements must depend on the circumstances of each case.

We are unwilling to accept the doctrine, stated in the Minnesota and Pennsylvania cases, that evidence which would be incompetent as hearsay in other cases should be considered competent in cases for compensation under the Workmen's Compensation Act. So to hold would tend to change the liability of the employer from liability for injuries or death arising out of and in the course of the employment to the liability of an insurer of the wellbeing of his employee. The compensation act does not put that burden upon the employer.

"Hardship in a particular case does not warrant an exception to the hearsay rule, but the existence of a class of cases in which hearsay is the only possible proof necessitates an exception." 3 Jones, Commentaries on Evidence

(2d ed.), sec. 1195, p. 2191. The Supreme Court of the United States has said: "If the circumstance that the eyewitnesses of any fact be dead, should justify the introduction of testimony to establish that fact from hearsay, no man could feel safe in any property, a claim to which might be, supported by proof so easily obtained." *Mima Queen v. Hepburn,* 7 Cranch 290, 2 S. Ct. 535. To deny compensation for failure of proof in this particular case does not necessarily mean that compensation must be denied in all death cases where there are no eyewitnesses to the alleged accident. We recently stated the following rules which are applicable to the case here: "The burden of proof is upon the claimant in a compensation case to establish by a preponderance of the evidence that personal injury was sustained by the employee by an accident arising out of and in the course of his employment. * * * A compensation award cannot be based on possibilities or probabilities, but must be based on sufficient evidence that the claimant incurred a disability arising out of and in the course of his employment. * * * The rule of liberal construction of the Workmen's Compensation Act applies to the law, not to the evidence offered to support a claim. The rule does not dispense with the necessity that claimant prove his right to compensation within the rules above set out, nor does it permit a court to award compensation where the requisite proof is lacking." *Chambers v. Bilhorn, Bower & Peters,* 145 Neb. 277, 16 N. W. 2d 173.

The statute requires that this court, where it is found, that the findings of fact are not conclusively supported by the evidence as disclosed by the record, consider the cause here *de novo* upon the record. This appeal calls for an independent conclusion on the record. The conclusion is that the plaintiff has not made out a case for an award of compensation.

The judgment of the district court is accordingly reversed and the action dismissed.

REVERSED AND DISMISSED.

YEAGER, J., concurring in the result.

I find myself in full accord with the result arrived at in the majority opinion, but with some of the statements in the opinion and syllabus I find myself in disagreement.

For convenience I shall, for the most part, refer to the syllabus points rather than the corresponding parts of the opinion.

It will be noted that one of the questions of controlling importance was that of whether or not certain statements claimed to have been made by the deceased were *res gestæ* and on that account admissible. I agree that they were not admissible. I do not agree that the definition of *res gestæ* contained in point 5 and pursued in points 7 and 8 of the syllabus is correct.

A definition of *res gestæ* which has been approved by this court is quoted in the opinion as follows: "A statement to be admissible as a part of the *res gestæ* must have been spontaneous and impulsive, and made at a time and under such circumstances as to induce the belief that it was not the result of reflection and premeditation." *Tongue v. Perrigo,* 130 Neb. 564, 265 N. W. 737.

The majority opinion does not reject this rule but its effect is to narrow and restrict it. The effect of the rule of the opinion herein is to say that it is not enough that all the conditions contemplated by this definition shall be found to exist to render evidence admissible as a part of the *res gestæ,* but in addition thereto the court must be satisfied that those conditions flowed from *shock.* Under this definition the showing of *shock,* or evidence from which a reasonable inference thereof flows, becomes imperative as a foundation for the introduction of *res gestæ.* The effect is further to make a pathological finding a prerequisite to the admission of statements as *res gestæ.*

The term *shock* has been employed illustratively many times in opinions, and with that I find no fault, but seldom definitively as in the majority opinion. It appears that it was used definitively in *Chesapeake & O. Ry. Co. v. Mears,* 64 F. 2d 291. However in that opinion other definitive lan-

guage was used not employing this term. The other language referred to is contained in the majority opinion and will not be repeated here.

If I were inclined to restrict the definition of *res gestæ* I would desire to use a word or words capable of some measure of definiteness in understanding and definition. *Shock* is not so capable. Within certain limits it has an understanding by laymen, within broader limits it is understood by men of special training such as the medical man, the psychiatrist and psychologist, but it baffles even the scientist and the lexicographer in inclusive and exclusive definition. With its inexactitude of meaning it should not be written into legal definition to confound the legal profession and the courts.