BERTHA ESCHENBRENNER, APPELLANT, V. EMPLOYERS MUTUAL CASUALTY COMPANY, A CORPORATION, ET AL., APPELLEES.

84 N. W. 2d 169

Filed July 5, 1957. No. 34161.

Beatty, Clarke, Murphy & Morgan, Donald W. Pederson, and Frank E. Piccolo, Jr., for appellant.

Holtorf & Hansen, W. H. Snyder, and Joseph H. McGroarty, for appellees.

Heard before SIMMONS, C. J., MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action brought by Bertha Eschenbrenner, the widow of Charles W. Eschenbrenner, deceased, a police officer of the city of Crawford, plaintiff, against the Employers Mutual Casualty Company, a corporation, and the City of Crawford, defendants, under the Nebraska workmen's compensation law. The case was tried

before a judge of the Nebraska Workmen's Compensation Court resulting in the dismissal of the plaintiff's claim. A rehearing before the Nebraska Workmen's Compensation Court was waived and the plaintiff appealed directly to the district court. The cause was tried before the district court for Dawes County. The trial court dismissed the plaintiff's petition, thus denying her claim for compensation. From the judgment of the district court, the plaintiff appealed.

The plaintiff in her petition alleged that she is the widow of Charles W. Eschenbrenner, deceased, and was wholly dependent upon his earnings for support; that on or about August 22, 1955, her husband was employed by the city of Crawford as a police officer at an average weekly wage of more than $45; and that while so engaged in his employment, he sustained personal injuries arising out of and in the course of his employment resulting in his death on August 22, 1955. The petition also alleged notice and claim of compensation, and the amount of burial expense; and that the defendant insurance company issued an insurance policy, the premium being paid by the city of Crawford, wherein it agreed to pay, on behalf of the city, compensation in the event a peace officer employed by the city should sustain injuries by virtue of an accident arising out of and in the course of his employment, including death as a result of such accident, and other benefits payable under the workmen's compensation law had the insured employee and the city been subject to such law.

The defendants' answer denied that the death of Charles W. Eschenbrenner was caused by an accident arising out of and in the course of his employment, and prayed for a dismissal of the plaintiff's petition.

For convenience we will refer to Bertha Eschenbrenner as the plaintiff; to Charles W. Eschenbrenner as Mr. Eschenbrenner or Chalky, a nickname by which he was known; to the city of Crawford as the city; to the witness Jake Himmer as the night police officer or

Himmer; to Victor Hansen, a member of the State Safety Patrol, as the patrolman; and to the sheriff and deputy sheriff of the county as sheriff and deputy sheriff.

The plaintiff testified that she had resided in the city about 48 years; was the widow of Charles W. Eschenbrenner, commonly known as Chalky; and that her husband was employed by the city as chief of police for about 23 years. Immediately before his death, which occurred on August 22, 1955, he was 62 years of age. She knew he had suffered from a heart ailment for 2, 3, or 4 years prior to his death, and was under treatment for this condition. His appearance did not change in any way from the time he suffered with this trouble, nor did this ailment affect his daily life. He lost no time from work on account of such ailment. Crawford is a city of about 1,800 population. On August 22, 1955, Chalky left home after his usual breakfast, dressed in his uniform. About 10:30 a. m., she learned that there had been some excitement in the city, but she did not hear that Chalky had collapsed until she went to the hospital about 11:45 a. m. When she arrived at the hospital Chalky was in a very excitable condition. He was on the bed with his clothes on. He was raving and talking, trying to tell the doctor what had happened and of his difficulty in endeavoring to save the children of Lane who had become mentally deranged. About that time an oxygen tent was placed over him. His clothing emitted an odor that was quite strong. He died about 2½ hours after being admitted to the hospital. On cross-examination she testified that Chalky took medicine every day at home, but never complained about a pain in his chest, or anything at all.

Lorraine Haas, a daughter of the Eschenbrenners, testified that she lived in the country, and came to the city the morning of August 22, 1955, about 9 a. m. While at the Hagemeister place, across the street from where her father collapsed, she was informed of what was going on and the trouble in which her father was in-

volved. She ran across the street to where her father was standing by the Morrison lumberyard. There was a small building, which is called a little house and will hereafter be referred to as the house, 6 or 7 feet east of the lumberyard. When she first saw her father he was preparing to go up the street to the office of the police judge to obtain a warrant. She talked to him. There were other people there, including the patrolman and the city attorney. She inquired of her father as to what was going on, and he told her that Lane "just held a machine gun in my belly" and told him to get out or he would kill him, so he left. Lane also said he would kill the little children he had with him (Lane's little daughters) if anyone came near. She told her father to be careful. Chalky then went toward the office of the police judge, a short distance east on the same side of the street where they were standing. She went over to an implement shop to find her husband and inform him of what was taking place. She then went back to the Morrison lumberyard and went into the office building. There were windows on the east side of the office building where she could observe a part of what was taking place. This was about 11:30 a. m. As she was looking out the window she saw her father come back from the office of the police judge. He was walking quite rapidly. He was carrying a "sap" in his pants pocket. The patrolman came up. Her father took the "sap" out of his pocket and broke the window in the little house, and the patrolman shot gas into the house. After that the children were brought from the house. Lane's wife was in the lumberyard office and this witness helped her quiet the children. Someone came in and told her that her father had collapsed. She immediately went to his assistance. When she arrived at his side he was "wringing wet" with perspiration and in a weakened condition. She talked to him and he told her he would be all right, that the gas made him sick. He smelled strongly of gas which had a sickening smell. She re-

mained with her father until the doctor came. She went to the hospital, saw her father, and observed the same smell emitting from his clothing. It made her "deathly sick," caused her to vomit, and lie on the floor.

Victor Haas, the son-in-law of the Eschenbrenners, testified that he had known Chalky since 1934, and that he was married in 1940. From that time on he saw Chalky nearly every day, and he noticed no difference in Chalky's appearance after learning that he had heart trouble. Such trouble never kept him from performing his duties. After his wife told him about what was happening the day of the trouble, he immediately went to the Morrison lumberyard which faces north. Six or 7 feet east of the lumberyard there was a little house which also faced north. This house was 19 or 20 feet from east to west and approximately 30 feet from north to south. This house was close to the sidewalk, and did not have a yard. The front door was of heavy oak and about in the center of the north side of the house. There was a window on the west side of the house. Looking through the window in the lumberyard, a person could see the window in the west side of the house. There was a step at the front door of the house which was 6 or 7 inches high and from 20 to 24 inches deep. There was also a door on the south side of the house. There was a basement window to the east and rear of the house. He arrived at the scene about 9:30 a.m. Chalky was there, and at that time was coming out of the door of the lumberyard office. Chalky said Lane had "gone off his rocker" and had two children and was going to kill them, or threatened to do so. Chalky then told this witness about Lane sticking a gun in his "belly" and telling him to get out and stop interfering. He further testified that Chalky was excited and looked worried; that he was worried about the children; and that his actions were quicker than normal. After Chalky told him what had happened, he stepped back. Chalky then went toward the south, and before he got

to the back of the house the patrolman came and he and Chalky had a conversation. They went around the house and talked to the night police officer. Chalky at that time was in command, had the officers staked out in certain positions, and was shifting from one place to another. Chalky was "hollering" loud to Lane to let the children out. The officers were planning at all times how they might get the children out. He then recited the manner in which the window was broken and the tear gas shot into the house. Immediately after this occasion, Chalky went to the back of the house where another discussion was held, and Chalky came back to the north side of the house. There were some muffled sounds coming from the house which sounded like a gun. This witness and Chalky went back to the south part of the house. Lane had shot out through the basement window. Chalky, the patrolman, and the night police officer talked the matter over and concluded from the shots they had heard that Lane was in the basement of the house. About 20 minutes after that, Chalky came around to the front of the house, used his left foot, and kicked the front door about the height of the doorknob five or six times. The last time he did so, he lost his balance and was about to fall, but regained his balance. This witness then walked up and kicked the door in. After he did so, he dropped back 15 or 18 feet behind Chalky because of the gas which was bothering him. Chalky stood at the door about 2 minutes, looking around, then stepped back. The sheriff was there, and they talked. Chalky again went to the back of the house and this witness followed him. The night police officer was at the back of the house, and while they were there the night police officer went to the back door of the house and went in. Before he did so, there had been some shooting; about 7 shots came out of the back door. The bullet holes were at the bottom of the door. A little later Chalky went up to the back door, stood just around the corner

of the door that went to the basement, and told the night police officer to come out, that Lane might shoot up through the floor. While the night police officer was in the house, Chalky stuck his head in the door, but not for long. He stayed in that vicinity 2, 3, or 4 minutes, calling to Lane to come out and let the children out. Lane yelled out that if they used any more tear gas he was going to kill the children. Lane came out of the house carrying a baby girl in one arm, and he had a rifle, a pistol on his side, and a knife in a scabbard attached to a makeshift belt. As Lane came out, Chalky went to the east side of the back door and drew his gun. The patrolman, the deputy sheriff, and the night police officer were there. Chalky took the pistol from Lane. At that time Chalky was pale and a "little wobbly." He walked back to a tin shed which was in close proximity to the lumberyard and leaned against the shed. Chalky started to vomit, and did so twice. This witness went over to Chalky. The patrolman was also there and endeavored to get Chalky to let him take him to the city hall. Chalky refused, saying he would be all right. He started to slump down, and was held up by this witness and Chalky's son who was there. He was carried to the alley where he was when the doctor arrived.

The night police officer testified that after Chalky's death he became chief of police. He detailed the duties of the chief of police as follows: He patrols the streets and the alleys in a car or on foot; takes care of the dump; makes arrests of drunks or peddlers; and performs other duties which are not of an unusual nature. He further testified that during the last several years of Chalky's life he saw him daily, and he always appeared normal, attended to his duties, helped to keep the streets clean, and on occasions would take a shovel and shovel snow or help the men generally in addition to supervising their work. On August 22, 1955, this witness arrived at the scene of the trouble about 8:10

or 8:30 a. m.  He was with or near Chalky at all times, except when he went home to get a gas gun.  He further testified that Chalky gave the orders to him and to the others connected with the work; that when Chalky was loafing he moved slowly, but if something happened that required his attention, even at a distance, he moved rapidly; that was the manner in which he was moving that particular morning, walking very rapidly, moving from place to place and talking with the other officers about matters connected with the job; and that Chalky yelled and talked loudly to Lane before and after the window had been broken and the tear gas shot into the house.  This witness talked to Lane's wife with reference to the manner in which they might be able to get to Lane.  She described the basement window which might be raised.  This witness attempted to do so at the time the tear gas was shot through the window, and Lane shot through this basement window seven times.  Shortly after that, this witness entered the house.  Chalky was still trying to get Lane to come out and give himself up.  Lane yelled that he would shoot the children if any more gas was shot into the house, or if the gas got to him.  After this witness entered the house the gas was quite strong. It choked him and made his eyes water.  He was wanting Lane to come out with the children, and pleaded with him to let the children come out.  Lane wanted to know what would happen if he did come out, and he was assured that nothing would happen if he sent the children up.  Chalky was still at the back door.  One of the little girls came up.  He got hold of her and took her out the front of the house.  After that this witness went to the rear of the house where they had Lane.  Lane started to swear at Chalky and this witness took Lane away, after he was disarmed. He further testified that it was an extremely hot day; that he went back to the house every day for a week;

and that it took that length of time to get the gas out of the house.

On cross-examination this witness testified that when he arrived at the scene of the trouble Chalky was at the northwest corner of the lumberyard office, and eventually the sheriff and the patrolman came. Chalky took this witness into the lumberyard office, told him where to sit to watch the back door of the house, and said that he would watch the front door. It was agreed between the officers who were there that the patrolman should go after the tear gas. This witness watched the back door continuously until the patrolman returned. He further testified that there was not much activity until the patrolman brought the tear gas back. He heard Chalky yell at Lane, endeavoring to get Lane to surrender and send the children out. He further testified that he had seen Chalky arrest a number of drunks, and that he handled the arrests without much difficulty; that Chalky could get tough if he wanted to; that when Chalky started to jail with a man he went to jail whether he wanted to or not; that at times this involved a great deal of physical exercise; that he had seen Chalky disarm people carrying guns, shake them down, and apprehend them, not knowing whether they had guns or not; and that Chalky arrested persons for other offenses, meaning the general run of violations, and had dealt with suspicious characters and strangers at times who were required to be shaken down.

The patrolman testified that on the morning in question he happened to go through Crawford and met Chalky in front of the lumberyard. Chalky related the details about Lane sticking a gun in his stomach and Lane saying to Chalky: "Chalky, I like you, and you are a good man, but you turn around and get out." Chalky said he would if Lane would let him take the children out, but Lane refused. This witness testified that while he was around, he left matters up to Chalky.

He and Chalky contacted Lane's wife, who was in the lumberyard office, as to the best method to get in contact with Lane, because they wanted to use tear gas. She explained that there was a telephone next to the window on the west side of the house. Lane had been called by Chalky on the telephone with reference to this matter. They called Lane over the telephone, believing that he might be in that area of the house. This idea was unavailing. When this witness first saw Chalky he seemed natural. However, as the day went on, Chalky became a little more nervous, did a little more running around, and moved rather fast, but he always moved fast when he had something to do. He further testified that they went out along the side of the house, Chalky on the south side of the window. Chalky broke the screen, unhooked it from the inside, took out his "sap," and broke the window. He called to Lane a number of times. Chalky then jerked the shade from the window, and this witness stuck the gun into the window and let the tear gas go. It was tear gas known as "CN." After that they went to the lumberyard, then to the back of the house. This witness was near the back door of the house at all times, thinking Lane would come out that way. Chalky was at the door near the corner of the house, calling to Lane to come out or send the children out. Lane sent the little girl up, and later Lane came up armed as testified to by a previous witness. This witness shook Lane down, and as he looked up, Chalky was starting to weave a bit. This witness told Chalky to get back out of the line of the door and get away from the gas. Chalky said that he was all right, to leave him alone. Chalky had the appearance of a person about to faint. The patrolman went back to his work, and the next time this witness looked up Chalky was back toward the shed and some of the men were with him.

On cross-examination the patrolman testified that he arrived at the scene of the trouble about 8:45 a. m.;

that he left about 9:35 a. m., to go to Scottsbluff to get the tear gas; and that he returned at 11:15 or 11:30 a. m. He was gone approximately 2 hours.

The testimony of other witnesses with reference to the crowd and the fact that Chalky was hurrying back and forth and yelling at Lane endeavoring to get the children out and Lane to surrender for the most part is corroborative of the testimony of the officers.

Dr. Bishop, the family doctor of Mr. Eschenbrenner who prescribed for him and was in attendance upon his death, and Dr. Clarke, a physician and surgeon, testified for the plaintiff. Dr. Brown, a pathologist, testified for the defendants. The testimony of the foregoing doctors is long and involved and in disagreement on certain points. It would serve no useful purpose to detail their evidence, except to give their opinions, taking into consideration all the facts and circumstances shown by hypothetical questions or, as in Dr. Clarke's testimony, based upon what he heard from the witnesses, he having been present in court at all times when the testimony of the activities of the deceased were related.

Dr. Bishop testified that he had known the deceased since 1949. In November 1951, he treated the deceased. His original diagnosis was not that there was a heart attack, but a coronary sclerosis. The deceased had an old occlusion or thrombus in the left coronary artery which was partially organized and had been recanalized so that there was an attempt of some blood supply going through it again. He further testified that he rechecked the deceased in 1952. At that time he had arteriosclerosis and was given medicine to dilate the coronary blood vessels. The deceased took medicine until the time of his death. When the doctor rechecked the deceased, he found his condition to be about the same. The pain was less severe and permitted him to carry on his duties more comfortably. While there is apparently some doubt as to the dates in the record, whether he first treated the deceased in 1952 and re-

checked his condition in 1953, this fact is of no material importance. This witness saw the deceased going about his business almost daily, and observed no material change in his physical condition from that time until the date of his death. On the date of his death, this witness received a call about noon. He found the deceased in the alley behind a building. He described his condition at that time as being in a "cold type of sweat." He had an ashen gray color, was pale, complained of chest pain, and was apprehensive. His pulse was lower than usual, but he was not in shock. His blood pressure was 110 to 120. He had difficulty in breathing. At the hospital he was placed in an oxygen tent. In a few minutes time his blood pressure dropped down until he finally had none at all. He was given drugs to try and elevate the pressure above the shock level, which did not work, and the pressure never did come back. This witness diagnosed the cause of death as an acute myocardial infarction, which is explained as an area of the heart cut off from blood supply to the heart muscles due to the clot in the heart blood vessels and the coronary blood vessels. It was his opinion that the activity which the deceased had gone through helped to bring on the heart attack in a matter of minutes. A hypothetical question containing the evidence with reference to the occurrences, and including his treatment and knowledge of the deceased, was propounded to this witness. He gave his opinion, in answer to such question, that the overwork and the strain the deceased was under definitely precipitated the heart attack which caused his death.

Dr. Clarke gave as his opinion, assuming the truth of all the facts testified to by all of the witnesses and including the facts testified to by Dr. Bishop but not his conclusions, that the deceased died of a coronary thrombosis which was induced by emotional and physical strain beyond the ordinary, and possibly induced or made worse by inhalation of tear gas. He was in ac-

cord with the treatment given the deceased by Dr. Bishop. He admitted that, because of the very advanced diseased condition of the heart, the deceased could have suffered a fatal attack at any time and under any conditions. He would not concede that it would require quite a little exercise to precipitate this fatal attack.

Referring again to the testimony of Dr. Bishop, he related the facts with reference to the deceased's arteries, testifying that the arteries were badly diseased, and that the occlusion in the right coronary which caused the death was, in his opinion, "massive." The right coronary artery was very small. The narrowness of this artery was due to plaques, diseased conditions, rigidity, and calcification which disclosed a very advanced coronary sclerotic condition. The condition of the arteries was such that one could expect a thrombus or clot, or occlusion to form at any time. This testimony on this point is not disputed by Dr. Clarke.

Dr. Clarke testified further that considering the advanced coronary sclerosis and advanced diseases, and the fact that he had an old mural thrombus, plaques, and calcification, this thrombus could have occurred and formed while he was at rest at home.

Dr. Brown, the pathologist, testified in behalf of the defendants. He testified that it is the function of a pathologist to determine the nature of diseases. The purpose of a post mortem is to enable the physician to evaluate the disease processes with reference to the cause of death. He performed the post mortem on Mr. Eschenbrenner. The autopsy disclosed the following condition of the heart: The pertinent findings consisted of a very advanced sclerosis in the coronary vessels, in which there was an old occlusion of the anterior descending branch of the left coronary, and a recent occlusion of the right coronary. In addition to that there was advanced heart sclerosis in the coronary system in general with calcification of the wall, and scattered through the myocardium were occasional old scars from previous infarc-

tions. There was no evidence that was visible to the naked eye that resembled a recent infarct. The occlusion which caused the death was that described in the right coronary which was occupied by the recent thrombus.

In answer to a hypothetical question detailing the evidence and activities of the deceased on the day in question, Dr. Brown gave as his opinion that the physical activity and the emotional stress of the deceased had no part in causing the coronary thrombus; that the deceased could have had a coronary occlusion which would have been fatal at any time under any circumstances and under any conditions; that his heart was in such condition that he could have expected death at any time, regardless of any activity or excitement; and that the coronary vessels of the deceased were at the end of their usefulness.

With reference to the tear gas, the witness testified that it is an irritant, and there is no poison constituting a part of its ingredients. He found no evidence of irritation in the lungs. His opinion was that the death resulted from coronary occlusion, and not from the effects of the gas.

On cross-examination he stated that the activities in which the deceased was involved could have aggravated his condition, but due to the critical condition of his heart any activity could have aggravated it because the deceased had no cardiac reserve.

The plaintiff assigns as error the finding of the trial court that the evidence adduced by the plaintiff was insufficient to entitle her to the benefits of the Nebraska Workmen's Compensation Act; that the trial court erred in failing to find that Mr. Eschenbrenner died as the result of injuries sustained in an accident within the meaning of the Nebraska Workmen's Compensation Act; and that the findings of the trial court were contrary to the evidence and to the law.

In a workmen's compensation case an appeal to this

court is considered and determined de novo upon the record. Jones v. Yankee Hill Brick Manuf. Co., 161 Neb. 404, 73 N. W. 2d 394.

The word "accident" shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury. See, § 48-151, R. R. S. 1943; Roccaforte v. State Furniture Co., 142 Neb. 768, 7 N. W. 2d 656; Anderson v. Cowger, 158 Neb. 772, 65 N. W. 2d 51; Feagins v. Carver, 162 Neb. 116, 75 N. W. 2d 379.

In order that a recovery may be had in an action under the workmen's compensation law it must be proved that an accident occurred arising out of and in the course of employment which accident produced injury that resulted in disability or death. Ruderman v. Forman Bros., 157 Neb. 605, 60 N. W. 2d 658; Hassmann v. City of Bloomfield, 146 Neb. 608, 20 N. W. 2d 592; Anderson v. Cowger, *supra.*

In order to recover, the burden is on the claimant to prove the foregoing by a preponderance of the evidence. Ruderman v. Forman Bros., *supra;* Hamilton v. Huebner, 146 Neb. 320, 19 N. W. 2d 552, 163 A. L. R. 1.

An award of compensation under the Workmen's Compensation Act may not be based on possibilities, probabilities, or speculative evidence. Feagins v. Carver, *supra.*

The foregoing authorities are applicable to the instant case. In connection therewith, the question arises: Did Mr. Eschenbrenner, as an employee of the city of Crawford in the capacity of chief of police, suffer an accident within the meaning of the Workmen's Compensation Act and, if so, did death result from the accident?

We make reference to the evidence heretofore set out. Without too much repetition we summarize some of the evidence as to exertion and emotional stress placed upon Mr. Eschenbrenner to determine whether or not it was

in excess of that required of him in carrying out his duties as chief of police on August 22, 1955. It appears that Lane was apparently insane and had secluded himself in his home. The chief of police entered Lane's home and endeavored to persuade Lane to let him take the children out. Lane pressed a pistol to the officer's stomach and told him he liked him, that he was a good man, that he did not want to hurt him, and asked him to leave, which Eschenbrenner did. Almost immediately thereafter the officer apparently decided to file a complaint against Lane and obtain a warrant for his arrest. There is nothing in the evidence to show that the officer was excited at that time, or that he had undergone any unnecessary exertion except that within the lines of his duties as chief of police. That was the type of job he had. On occasion emotional stress and strain and physical exertion are involved in such a job. By the time this officer returned from the office of the police judge there were capable law enforcement officers at the scene of the trouble, including Himmer, the night police officer, the sheriff of the county, his deputy, a safety patrolman, and the city attorney. These officers were staked out at vantage points to watch the doors of the Lane home. Many conferences were held by them. Finally it was decided by the officers that the best method of apprehending Lane would be the use of tear gas. The patrolman left about 9:35 a.m., to go to Scottsbluff to procure the gas. He was gone approximately 2 hours. During the interim, about the only activity that was carried on was yelling or talking to Lane and by the use of the telephone in an endeavor to persuade him to give himself up and to let the children come out, which he refused to do. All of the officers, during all of the time that these events were taking place, were exposed to the same hazards as the chief of police and to the same amount of physical exertion, all of which were incidents of their employment. While admiration should be extended to this efficient officer, we find nothing in the

evidence to disclose that he was performing any duties other than those which he would ordinarily be obligated to perform as chief of police of the city of Crawford.

We have held repeatedly that mere exertion, which is not greater than that ordinarily incident to the employment, cannot of itself constitute an accident, and if combined with preexisting disease such exertion produces disability, it does not constitute a compensable accidental injury. See, Foster v. Atlas Lumber Co., 155 Neb. 129, 50 N. W. 2d 637; Hamilton v. Huebner, *supra;* Gilkeson v. Northern Gas Engineering Co., 127 Neb. 124, 254 N. W. 714; Anderson v. Cowger, *supra;* Feagins v. Carver, *supra.*

The plaintiff cites decisions from other jurisdictions. In referring to the decisions of other jurisdictions it must be borne in mind that the compensation laws of the various states differ widely in many essential respects. The diversity of public policy demonstrated by the differences in the various laws must be considered before decisions of other jurisdictions can be accepted as controlling precedents. See Bekelski v. Neal Co., 141 Neb. 657, 4 N. W. 2d 741.

The case of Brown v. City of Omaha, 141 Neb. 587, 4 N. W. 2d 564, which is in point with the case at bar, was a proceeding under the Workmen's Compensation Act involving a fireman fighting a fire. The city objected to the allowance of the claim on the ground that the disability of the plaintiff was due to a preexisting heart disease and not to a compensable accidental injury which arose out of and in the course of his employment as the evidence showed that the plaintiff suffered from previous chronic arthritis and heart disease. Counsel for the city argued that physical exertion and exposure to smoke and fumes, ordinarily incidental to the work of a city fireman in fighting a fire, even when combined with a preexisting heart disease producing coronary thrombosis at a later date, did not constitute an accidental injury compensable under the Workmen's

Compensation Act. Other firemen worked alongside of this fireman, did practically the same duties, were caused to vomit, and suffered as much as the claimant. This court held, in line with cases previously cited, that mere exertion, which is not greater than that ordinarily incident to the employment, which combined with pre-existing disease produces disability, does not constitute a compensable accidental injury.

The rule of liberal construction of the Workmen's Compensation Act applies to the law, not to the evidence offered to support a claim. This rule does not permit a court to award compensation where the requisite proof is lacking. See Hamilton v. Huebner, *supra*.

We conclude, in the light of the authorities heretofore set forth and the facts shown in the record, that the trial court did not err as contended for by the plaintiff.

The judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.

CARTER, J. participating on briefs.